524-0726 People v. Michael Schneringer Mr. Baldwin, when you are ready to proceed, you may approach the lectern. The next case is 524-0726 People v. Michael Schneringer. Mr. Baldwin, if you would state your name when you begin, that would be great. Good morning, Your Honors. May it please the Court, my name is Philip Baldwin and I represent the appellant Michael Schneringer. Your Honor, my client is an over-the-road truck driver. On October 9, 2018, he received a call from work to come in and pick up shipment at midnight. Back in 2018, he was 57 years old. He had a perfect criminal and driving record. That night, Mike drove from his home in Wood River, from his home to Wood River, Illinois, as he neared the trucking depot. He passed a police car sitting at a lighted intersection. He saw the officer turn onto the road behind him and it followed him several hundred feet to his place of employment, where he stopped in the road in front of his office, as was customary, to walk in and get his samples before going to hook up to his trailer. Knowing the officer was behind him, he waited a few seconds, then stepped out of his vehicle, stepped to the center of the road, and spoke to the officer who was still sitting in his car with his lights off, who was parked approximately, according to the officer, about 12 feet behind him, and said, According to the officer, he stepped... According to the officer, Mr. Scherringer approached his car in an aggressive and threatening manner, used various language at multiple times during his testimony, and when the officer challenged the defendant about the nature of the stop, claiming he hadn't used a turn signal at a previous intersection, my client advised that he had used his turn signal. The officer testified that he attempted to de-escalate the situation. He stated, Well, perhaps your turn signal didn't work. It's a traffic signal. It's not the end of the world. We're going to get through this. I tried to de-escalate the situation by offering him an out, basically. Let me ask you a question. We're pretty familiar with the facts here. Yes, you are. And we've read your brief, and if my colleagues don't mind, I'd like you to get to the issue of the obstruction, the law, of this. Absolutely, Your Honor. If you wouldn't mind. Sure. Do you have a question on the facts? No, I'm fine with that. Okay. You're limited in time, so... Yes, Your Honor. Okay. This case is about the line between a brief traffic stop and the criminal offense of knowingly obstructing a peace officer. Under Illinois law, obstruction requires more than a momentary noncompliance or confusion. It requires conduct that actually, in material, impedes an authorized police act. And the obstruction must be knowingly done. The landmark cases are Baskerville, Colmage, and Mehta. And when you say knowingly done, what is the standard on that? So, in Mehta, it lays knowingly out as being consciously aware that obstruction was practically certain to result from its conduct. Now, there's a specific jury instruction that addresses the question of the definition of knowingly in this context. And we asked for that instruction, Your Honor, but we were denied it. We also asked for a non-pattern jury instruction to address the question of whether what the search manager did was obstruction or not. The court also denied that non-IPI instruction. It was a non-IPI instruction? It was, Your Honor. I think our argument in jury instructions was that the law has been interpreted to change pretty significantly since Baskerville, Colmage, and Mehta was decided by the Supreme Court and by the Third District. It required more than just saying, well, knowingly is a common word, and the jury should know what a common word is. Unless they ask for clarification, we should not send further knowledge back with them. Obstruction is not a, the obstruction statute is not a general command compliance statute. The state had to prove that he knowingly resisted or obstructed the performance of an authorized act. We're arguing that knowingly and obstructed, as you've stated, carried legal content. So you're not arguing, excuse me one second, you're not arguing the fact that the stop was okay? Whether he was or was not turning that blinker, it was at least a Terry stop. Not going through the facts of the case with you. I would remind the judges that my client was found not guilty of the underlying act which led to this stop. The jury found him not guilty. And so the only question that remains for the court is whether in turning around from his car and walking back to his car, approximately three steps to, as he stated, show the officer that his turn signal worked, when the officer said that it perhaps didn't, that constituted obstruction. Now, we won't deny the officer, when my client turned around and walked back to his vehicle, said, stop, don't go back to that vehicle, stop right now. Clearly the situation got away from the officer. But he caused it by suggesting that my client's turn signal didn't work. He brought the situation and escalated it instead of de-escalating it. But does it matter when you're talking about obstruction, what point do you look at that, the stop? You don't look back, do you, to see if it was a valid stop based on what a jury did. Don't you look at it from the point of view of when the stop occurred? Yeah, absolutely, Your Honor. I would agree with that. We're not suggesting that there's a conflict involved in whether or not he had the right to stop my client, or whether or not he had the right to speak to my client. I think it's something that the court should take into consideration, though, to place these facts in proper context. And that's the argument we're making as it relates to the fact that he had the turn signal violation thrown out. The jury said there's not enough evidence to show that he did anything wrong to be stopped. And now he's stopping in front of his office, doing his job, asking the officer if there was a problem. And then things turn. Was he ever told to stay in his car at the jail? He was not. The officer never testified that he was told to stay in the car. He was never told to get back in his car. As a matter of fact, the officer subsequently testified that it's problematic to try to get people out of their car. That's when they're really worried. That's in his testimony. The last issue we've raised, and I want to hit it real quick before I run out of time, is that at trial, we attempted to utilize video evidence that we had gleaned from a passive semi-truck that was sitting across the parking lot facing our direction. It showed more video than what the state's body camera image provided. The state, in their handling of their evidence, of their video, was allowed to pause, move forward, ask questions, reverse, re-question, and piece and parse this four-minute section of video, of which only about 15 seconds was really pivotal to the case, and build their argument that my client had obstructed the officer's investigation based upon that. When we attempted to do the same, the judge in this matter said, no, I don't think the video is of sufficient quality. There will be no narration, no questions. You can establish date, time, and the persons that are there, but there will be no commentary over the course of the video. I believe that deprived my client of a fair opportunity to parse the evidence in this case. If we had had an opportunity to question the witnesses, and to specifically impeach the officer's testimony regarding that period of time between the stop and the time when the officer tasered my client and arrested him, we would have been able to point out inconsistencies through the witnesses to the jury with what the officer had testified to. I believe that's critical. What inconsistency do you think absolves your client of the crime, of the charge? Or do you think that the charge itself was insufficient, or both? I actually believe both, Your Honor. I believe that the evidence in the case shows that it supports my client's testimony about what actually happened. The fact that they engaged in the conversation once he stepped out of his vehicle, that he was not threatening, that he was not taking a fighting stance, as the officer testified, that he was not fleeing from the site, that he was not engaged in any kind of behavior that should have put the officer on a threatening or a threatened perspective. And secondly, I would say that with regard to that, did the video depict that? The video depicts my client stepping out of his vehicle, walking to the middle of the road. This is the video. This is our video. Right. Walking to the middle of the road. There's no audio. You can't hear the communication between the two of them. But his actions, his body actions, match what he testified. I went out there. A period of time passes. He moves back. The officer gets out of his car, turns on later his lights. Now... And you're talking about the trucker's video that's just pointing. That's correct. It's pretty far away, that video. I would say it's probably 100 feet away, Your Honor. And it's pretty grainy. It is grainy. And you have to look at it carefully. You needed narration. Absolutely, Your Honor, because when that went back to the jury, it's two minutes of silence on a grainy background that, to them, surely meant nothing. But if we had an opportunity to point out what it actually meant, how his actions corresponded to what he said happened that night, and how it didn't correspond with how the officer portrayed it... But is that self-serving testimony that's in it misquoted? I mean, just thinking about how you would get to narrate that. So, Your Honor, I wouldn't ask it of my clients. I would ask it of the state. I would ask it of the officers. I'm impeaching them based upon what he said previously. So you're impeaching evidence, not direct evidence. No, I think that would be bolstering testimony and impermissible, as Your Honor is well aware. You're out of time, so do you want to wrap up quickly? So, Your Honor, we're asking for the conviction on this matter, which, again, is just a misdemeanor. We're asking for this conviction to be thrown out, and the alternative to be remanded for trial so that we can properly present our case and show the jury the evidence of the way it needs to be shown. Do you have questions?  Questions? I don't think so. Thank you. All right. We'll have a few minutes after Mr. Hiso? Yes, Your Honor. Okay. Thank you, Mr. Baldwin. We'll hear from Mr. Hiso for the state. Good morning, Chief Justice, Your Honors, and may it please the Court. My name is Louis Hiso, and I represent the State Appellee on the matter. As this Court is well aware, the defendant raises two issues on appeal, but I would like to focus most of my time here on the second issue, if I have time, on the first. But I would also like to open it up for any questions that Your Honors would have at this time. We'll do that automatically. Yes, Your Honor. I did want to briefly respond to a comment that counsel made. He characterizes the video in question, that third-party video, as it is sent back to the jury as a two-minute detention of silence for, you know, that they would receive it and it would essentially mean nothing to them. And to that effect, I would just raise to the Court that that would be the case because there's absolutely no real substance to those videos. Sorry, I didn't catch the last part of what you said. No, there was no real substance that those videos— No substance, the video? Correct, Your Honor, in terms of anything that it would add for the jury to be able to determine anything. If they can't view it— It was admitted. It was admitted, Your Honor. There must have been some relevance that was found by the Court. The State raised a number of objections, foundational issues as well as the graininess, and I believe that the Court in this case just allowed the defendant to admit it so that they could have an opportunity to present the case. I don't really believe from viewing it that there is really anything that the video has added at all to this specific case, Your Honor. I think most of the incident was captured in the body-worn camera from Officer Holford's body-worn camera as well as his testimony. Again, it's the obstruction that the defendant was ultimately found guilty of, so that's the focal point of what we would essentially focus our analysis here on. And as to that issue, Your Honor, the State proved the defendant guilty of that obstruction beyond a reasonable doubt, and as this Court is well aware, we were only required to prove that he did so knowing— the defendant knowingly obstructed the officer while he was performing an authorized capacity and that he knew the officer was a peace officer. There is also the requirement that that obstruction has to be conduct that is an obstacle, that materially impedes or hinders the officer's performance. In this case— How did it do that in this case? Your Honor, just from watching the body-worn camera that was admitted at trial as well as taking the officer's testimony here, we see that once the officer pulls the defendant over, once the defendant comes out of the car, the officer activates his lights, there is already— Wait, let me stop you for a second. Was this a traffic stop? Did the officer pull him over? It wasn't. Did he stop on the zone in front of his— It was still considered a traffic stop. There were no lights on. The lights were not on. The defendant was coming out of the car by himself once he realized that the officer was tailing him through a dead end where he worked at. So the defendant walks out, stares at the officer, and then the officer activates his emergency lights to essentially initiate the traffic stop at that point. Now he— Wait, wait, wait. The car was already stopped. The truck was already stopped. Yes, Your Honor. And I guess I would— But isn't the initiation of the dash cam or the body cam— Was this a body camera or a dash cam? No dash cam. Only body camera once the officer activates and steps outside of the vehicle. His testimony is that— I missed the last part of it. Once the officer activates his lights, the body camera— The camera comes on, he steps out. And is that the reason to activate the lights so the camera comes on? I'm not entirely sure about this, Your Honor. It wasn't specified in his testimony. So I'm not sure if that's how they follow the procedure because they don't have the dash cameras, if that's how they do that. But Justice Barbera raises an important point. I think the stop had occurred before the traffic officer's lights— What do you call those? The red lights. Emergency lights, Your Honor. Emergency lights. Yeah. The emergency lights weren't even on yet. No, and I believe the defendant knew that he was probably going to have an engagement with the officer, which is why he steps out of the vehicle on his own volition and greets the officer instead of waiting for the officer to— Now, is that in evidence anywhere? That the defendant walks out before— No. You said that you believe that he under—he knew that he was going to have an encounter. My understanding of the testimony was that the gentleman stopped in front of his employer, as he was accustomed to, to walk in and do his jobs. So I guess my ultimate question is, with regard to the stop, was this driver under any obligation to stop when and where he did? No, Your Honor, and that's precisely what the officer's testimony gets into, in that this was a completely like—and I have the term that he called it. I believe he just called it—it was just an irregular stop, is how he essentially phrased it. I'm sorry. It was just irregular to him, to meet someone essentially waiting for him to turn on the lights. And so his testimony gets into the fact that he's already feeling like the tensions have already been elevated at that point. And so once he steps out of the vehicle, the officer then tries to engage the defendant regarding his lights, whether or not they were working. And to that end, the defendant becomes essentially argumentative, and at one point then turns away from the officer and starts walking towards his vehicle. Did I read correctly, though, that the defendant was tased nine seconds after the body-worn camera was turned on? And that was while he was walking away from the officer? Yes, Your Honor, and that is one of the factors that this Court can take into consideration with regards to the materiality of the obstruction. However, I would counter that in that what is most egregious here is knowing that the situation's already elevated, the officer testifying that he felt uncomfortable once the defendant then turns away, and then the officer's testimony and the camera showing that he repeated the commands three different times to the defendant before the defendant then reaches towards the door before taking out his taser and engaging the defendant. I believe that at that point, the materiality has become so elevated that there is an obstacle between the officer and him completing the traffic stop in a normal capacity. So my question, which was originally, how did this circumstance arise to the level of obstruction where it interfered with the officer's ability to do his job before he tased him? I want to know about those. I don't know if it was nine seconds, but it was fast. It was relatively quick. So I believe it was nine seconds watching the video. I want to know about that time. Isn't that the relevant time that we have to look at? Yes, Your Honor, but also considering, again, the state of mind of the officer and where he's testifying, I don't know whether he's going back to the vehicle to reach for a firearm. He's already waiting for me to activate my emergency lights at this point in the middle of the road. So we've begun the traffic stop in such an elevated manner that what the officer's testimony alludes to is that there is a certain sense of emergency with regards to how he's acting, how the defendant is then turning towards the vehicle and just that immediate action, stepping towards it without even telling the officer, well, hold on, I'm going to go and turn on my lights for you. It's just more or less this turning around, walking away from the officer. And so then the officer has absolutely no time to react in the nine seconds. Well, he does react. He does, Your Honor, and to that point, he does react accordingly to the defendant's actions here, which, again, is what we believe would rise us to that level of that obstacle because the stop didn't have to go that route. It could have went, here's what you did. I'm either issuing out a citation or a written warning, and we go about our day, and that's the officer's duty to essentially carry out the traffic stop and complete it accordingly. Once the defendant prevents the officer from completing that in that manner, the obstacle rises. And that's what we believe is those nine seconds where the defendant turns towards the vehicle that the officer then has to react by pulling out his taser in order to ensure the safety of his well-being at that point. And there's no dispute between the parties that anything occurred really before the body cam starts. In other words, not a lot of time, nothing was really going on. Your Honor, I believe the defendant tries to get into that a little bit with the video that he's trying to The third-party video.  But the officer is not testifying that anything of that materiality was going on for that period of time between the stop and the emergency lights starting. Yes, Your Honor, and that's essentially the point that we are trying to make on appeal with regards to our answer about the third-party video, that it really doesn't add anything to the obstruction. What was the, and I admit I have not had the opportunity to look at the third-party video because of some technical difficulties, but I do intend to see that. But tell me, you said that in answer to Justice Cates' question, it was the third-party video that was apparently going or tried to be used to depict what was going on prior to the lights turning on in those nine seconds or before the officer got out of his car. In your viewing of that video, what does that depict? What is that? I'm sorry. What does that depict, that third-party camera or video? What does it depict prior to the body-worn camera being activated? I believe the only thing that we can actually depict from watching that video is that there is a car that comes down that street where that dead end and the employer is at. You see a car coming down the street. Eventually, you do see an individual walk out, and then the lights come on from a squad car that's about 20 feet behind it. It's really difficult to see whether or not the defendant's turn signals could work. It's just so grainy and so blurry. And again, it doesn't add to the context of what now is the appeal to the obstruction because it's so far away, you can't make out any details about who's standing, where the officer is. But if the defendant would have been allowed to question the officer based on that third-party video, would he have been able to establish some of those things? Is this the defendant's vehicle? Is this your vehicle? What were you doing when he approached you, any of those things? So the officer was questioned a little bit with regards to the video, and I believe the officer's testimony was that he could not even tell who was on the video. So the defense was allowed to question with the video? Yes. I believe that's found in the record. And I don't have the specific page, and I apologize, Your Honor, but the officer gets into that. Yep, Officer Holford himself stated he could not identify any of the individuals after watching the video himself. So it's so grainy that the details are really meaningless to the jury at that point. But that's what he testified to. He was not cross-examined, because you can see an individual on the video, and you can see that car coming down, and we don't know the timing of all of that. And the officer was not questioned about that, was he? He wasn't. So the video, Your Honor, yes, the video was not allowed to be played during his cross-examination. It more or less came out later through rebuttal. All right, the judge made comments that the judge didn't think it was clear enough to cross-examine him on. Yes, and not only that, he restricts the defendant, as the defendant states, from using it during cross-examination as well. Okay, did you want to wrap up quickly? Your Honor, I would just ask the court to affirm the defendant's conviction. Thank you. Okay. No more questions. Okay, thank you very much for your arguments. Mr. Baumann? Yes, ma'am. I'd like to address Judge Barbera's question real quick about what you could see on the video. Now, the state has opined that you can't see anything. It's so blurry, you can't see anything. The judge restricted us to asking if the witness could identify the source, date, time, or people in the video. The officer said no, and that completed our ability to question him about what happened in that video. We had no other recourse at that point. But if you watch the video carefully, when you watch the video carefully, you can actually see the vehicles turning onto West Ferguson Avenue. You can see a flashing at the front of the vehicle. You can see the vehicle stop, not in the center of the road, as the state just described, but directly in front, on the side of the road, in front of his employer, as he had done thousands of times before. But he does get out of the car, right? He's out in the street. Absolutely, Your Honor. You wouldn't see a figure out in the street. He gets out of the car. He would have gotten out of the car to perform his duties at his employer. He sees the police officer behind him. I think it's quite reasonable to say, is there a problem, officer? I know I've done that a few times in traffic stops, with my fingers crossed. However, after he was tased, wasn't he apologizing to the officer for his conduct, indicating he knew he shouldn't have acted the manner he did? Your Honor, that's a point that the state has raised before. And what I would say is, my client was a mature man, 57 years old, never been in trouble with the law. He lay on the ground, screaming, apologizing. I'm sorry, I'm sorry, I'm sorry, I'm sorry, I'm sorry. That was more to get the tasing to stop than to acknowledge consciousness of the guilt. Is that what you're saying? That's exactly what I'm saying, Your Honor. He would have said anything to stop the nightmare that he was going through, when he was just coming to work to do his job. On the other hand, there wasn't a clear from the body cam. It has audio, right? And the officer testified, I was yelling, lallying him to stop, do not return to your vehicle. That's on the body cam also? Yes, what I would point out, Your Honor, is that the state, in their direct examination of that witness, Officer Holford, broke up their questionings, and again, the state has stated again today, he was given three separate commands, and broke it up like it was three separate commands. You watch the video, it's nine seconds. It's actually a little less than nine seconds, when you get down to it. He says, stop, don't go back to that vehicle, turn around, and pow, hits him with the taser. That's one command. Grammatically, maybe it's three sentences. Not my strongest suit. But yes, it was in a period of time of less than a fourth of a second that he made those statements. And now the state is trying to represent that these were, you know, three separate reasoned, calm commands, spoken in a loud voice. He clearly could have understood. My central point, Your Honor, is that he would have never turned around to walk back towards the vehicle if the officer hadn't said, well, your turn signals aren't working. There was no conversation about this is not a big deal, you know, it's not the end of the world. Well, that's not on the video. You've observed that video. There's no conversation, though, that he said he had with Mr. Schnaringer. He's the one who suggested... When does he say that he had that? I'm sorry, Your Honor? When does he say that he had that conversation? That's in his testimony on page 89 of the transcript of the second day of trial proceedings, Your Honor. But what happened in time? I'm sorry, Your Honor. Maybe he had the same question. I think he probably did, so I'll let you finish since you started. That's what I'm trying to figure out is when, what point in time does he say that? Was that before the video started? If it occurred, it would have happened before the video started. However, the officer testified that when Mike Schnaringer walked towards his vehicle, that was the first conversation that he had with the defendant. That's his testimony on the record, and that's probably page 88. That was what I was asking. So that's why I asked originally if there was any activity going on before the lights went on, because the body cam goes on at that point. Your Honor, my client testified that he had a conversation with the officer that lasted approximately a minute. There's two minutes of grainy tape from a distance. He testified that he was asked about what he was doing there. He testified that he said he was going to pick up a load and take it to Searcy, Arkansas, a load of flour. The officer asked him if he was driving a company truck, because obviously the officer was triggered by the fact that this was an old pickup truck that my client was driving through town at midnight. So this conversation would have been before the lights went on? That's correct, Your Honor. And your client agrees that that occurred? Yes, Your Honor. Okay, that's what I wanted to make sure. With the officer's testimony, the first conversation I had with him was when he walked back and I said, you know, I'm pulling you over for not turning on your turn signal. Now, I would also address the fact that, as you pointed out earlier, that he wasn't pulled over. He pulled over to stop in front of his vehicle. He wasn't sitting in the middle of the road. This is all about the officer's state of mind. This is all about what he's thinking inside his head, not the actions of my client, who did nothing suspicious, who did nothing egregious, except to say, I'll turn around and turn my turn signals on. What the body camera image shows, in response to your question earlier, Your Honor, the body camera goes on when the officer presses the button to turn it on. So it doesn't turn on when he turns on his lights? No, the dash cam lights, the overhead lights, the dash camera is activated by overhead lights. I thought there was no dash camera. But there is no dash camera video of this incident. We asked. They said they had none. Okay? They had no camera image of the alleged traffic stop of anything up to the point when he presses the button on his chest and activates the camera when he wants to. But even in that camera image, Mike Schoeninger is clearly heard saying, I'll show you. I'll show you. What is that other than a reference to a response to the officer saying, well, your turn signals don't work, then your turn signals don't work. I'll show you. He wasn't trying to impede the officer's investigation. He wasn't trying to, you know, interfere with the officer's ability to do his job. He was saying, you said my stuff is broken and I will show you that it's not. And in his mind- He didn't get the right to make that choice. Right? Well, Your Honor, I believe- That's where knowingly becomes important. Very much so. And I believe this is a, at best, a de minimis situation discussed in that where the courts have said, look, it's not do you instantaneously respond to the officer's command. Okay? You know, it's whether or not you had the mindset to say, I'm going to, I'm going to, you know, impede this officer's investigation. I'm going to know that my actions are going to impede his investigation. His actions were designed to further the officer's investigation if there was an investigation going on. You said my stuff doesn't work. I'll show you that it does. You said I didn't use my turn signal. I said that I did. Baskerville and Homer both addressed the issue of this back-and-forth language that you can have with an officer that does not constitute obstruction. Okay. Thank you, Your Honor. Isn't that getting, though, to the point that that's the jury's determination when the guy says, I'll show you, I mean, it could have been, I'll show you. Or it could have been, I'll show you my lines, or I'll show you. You don't mess with me. I mean, that's kind of in the purview of the jury, isn't it? It's whether they determine based on what they saw and heard is this obstruction or not. Sure, Your Honor. I respect that point. I would say that if the jury had recessed in the jury room with the full breakdown of the evidence that we had presented, then I would completely stand with their decision. We were prevented from doing that. It was unjust for Mr. Schenecter. Now, in your review of the video, you'll have to make the determination whether he's saying, well, I'll show you, or whether he's saying, I'll show you. There is a difference. It's only three words, but there's a difference. Thank you. Any other questions? No other questions. Thank you. Okay. Thank you. Thank you both for your arguments here today. This is a tough question. You've made tremendous arguments. And we'll take the matter under advisement and issue an order in due course.